UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTEMIZ ADKINS,<br><br>    Plaintiff,<br><br>v.<br><br>GARRETT ADKINS,<br><br>    Defendant. | Case No. 19-cv-05535-HSG<br><br>**ORDER GRANTING PETITION FOR RETURN OF CHILD UNDER SIXTEEN YEARS OLD**<br><br>Re: Dkt. No. 1 |

Pending before the Court is the petition filed by Petitioner Artemiz Adkins for the return of her daughter A.F.A. to Switzerland pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501, as implemented by the International Child Abduction Remedies Act ("ICARA"), codified at 42 U.S.C. §§ 11601, *et seq.* ("the Convention"). Dkt. No. 1.

The Court has considered the parties' testimony and evidence submitted at the evidentiary hearing; each of the declarations submitted by Petitioner and Respondent Garett Adkins, including their submissions in support of and in opposition to Petitioner's motion for a Temporary Restraining Order; the Verified Petition; and the Response to the Petition. Having considered the evidence carefully, the Court now finds that at the time of the alleged wrongful retention, A.F.A. was, and now remains, a habitual resident of Switzerland, and **GRANTS** the Petition.

**I.    BACKGROUND**

    **A.    Procedural Background**

Petitioner filed the instant petition on September 3, 2019, along with a motion for a temporary restraining order. *See* Dkt. Nos. 1, 6–9. On September 13, 2019, the Court granted in part Petitioner's motion for a temporary restraining order. *See* Dkt. No. 26. The Court ordered

that Respondent, as he agreed, is prohibited from directly or indirectly removing A.F.A. from the Northern District of California, until further order of the Court. *Id.* at 3. On October 1, the Court held an evidentiary hearing. *See* Dkt. No. 41. During the evidentiary hearing, the Court heard the parties' direct testimony; the parties were cross-examined; and the Court also admitted and considered exhibits regarding the parties' communications about A.F.A. and the parties' move to Switzerland. *See id.* The Court also considered the parties' trial briefs. *See* Dkt. Nos. 39, 40.

**B.     Findings of Fact**

Petitioner and Respondent married in 2005, and lived together in Scottsdale, Arizona. *See* Dkt. No. 1 at 3; Dkt. No. 8 at ¶ 1; Dkt. No. 27 at ¶ 2. In 2014, while they were living in Arizona, their daughter, A.F.A., was born. *See* Dkt. No. 1 at 3; Dkt. No. 8 at ¶ 2; Dkt. No. 27 at ¶ 2, Ex. A.

In 2016, Petitioner and Respondent decided to move to Switzerland. *See* 10/1/2019 Evidentiary Hearing Transcript ("Tr.") at 10:16–11:5; 24:5–21. They had been discussing the move for several years, following a joint trip to Switzerland in 2012. *Id.* Petitioner, in turn, had been considering refocusing her career away from her physically demanding position as a clinical dentist to something more sustainable in the long term. *See id.* at 10:4–15; 12:25–13:6. Petitioner and Respondent researched their move extensively, including quality of life, education, healthcare, and pensions in Switzerland. *See id.* at 24:5–17; 34:22–35:9; 119:3–14.

The family then prepared for the move: Petitioner, who had owned a clinical dental practice in Arizona, sold the practice in January 2017. *See id.* 11:14–16. The entire family then took a trip to Zurich, from March to June 2017, to explore possible employment opportunities. *See id.* 11:7–24. Petitioner began talking with the Straumann Group about a possible employment opportunity in Basel, Switzerland, and eventually signed a contract accepting full-time employment in July 2017. *See id.* at 10:6–11; 13:12–16; Pet. Trial Exs. 4, 22. Petitioner was set to begin work in November 2017. *Id.* Upon the family's return to Arizona, they lived in temporary housing and Petitioner sought temporary work as she was the primary breadwinner at the time. *See* Tr. at 11:21–12:5; 13:20–14:23. She worked as a contract dentist temporarily in Arizona. *Id.* But Petitioner canceled her professional liability insurance in July 2017. *See id.* at 13:17–21; Pet. Trial Ex. 3. The family also either sold or packed most of their belongings. *See*

2

Tr. at 25:3–10.

In late October 2017, Petitioner, Respondent, and A.F.A. moved to Switzerland. *See* Dkt. No. 1 at 3; Dkt. No. 8 at ¶ 2; Dkt. No. 27 at ¶ 4; Tr. at 15:7–9. Through Petitioner's position with the Straumann Group, the parties and A.F.A. obtained Swiss "B permits," which allowed them to reside in Switzerland. *See* Dkt. No. 27 ¶ 4; Tr. at 18:12–20:2; 50:12–22; 70:14–71:11; 99:4–5; Pet. Trial Ex. 35. The permits may be renewed annually. *See* Tr. at 19:5–12. After five years, permit holders may apply for permanent residency. *See id.* During the parties' first three months in Switzerland, they lived in temporary corporate housing through the Straumann Group, but they signed a lease on a home in Basel, Switzerland on January 27, 2018. *See* Tr. at 16:18–18:9; Pet. Trial Ex. 6. The lease has no fixed term; neither Petitioner nor Respondent has cancelled the lease; and it remains in effect. *Id.*

From November 2017 to December 2018, A.F.A. lived in Switzerland continuously with Petitioner and Respondent. *See* Dkt. No. 8 at ¶ 3; Dkt. No. 27 at ¶¶ 4–5, 10. She attended daycare in Basel, Switzerland, beginning in January 2018. *See* Dkt. No. 30 ¶ 4; Dkt. No. 30-1, Ex. A; Tr. at 27:25–29:4. She had a network of friends from daycare and through Petitioner's colleagues, who have children of similar ages. *See* Dkt. No. 30 ¶ 5; Tr. at 29:10–25. Petitioner and Respondent also anticipated sending A.F.A. to a German-speaking kindergarten in Basel beginning in 2019. *See* Tr. at 28:14–24; 30:1–31:19; 85:23–87:17; Dkt. No. 30-3, Ex. C. Thus, in June 2018, Petitioner and Respondent filled out a language competency questionnaire. *See id.* The Basel Department of Education directed the parties to confirm A.F.A.'s attendance at a German-speaking institution from August 2018 to June 2019 in preparation for kindergarten. *See* Dkt. No. 30-3, Ex. C. A.F.A.'s daycare qualified, as its base language was German, though children and teachers spoke multiple languages. *See* Dkt. No. 30 ¶ 8; Tr. at 28:19–24.

During the evidentiary hearing, Respondent raised for the first time that he and his family only moved to Switzerland on a trial or other temporary basis, and that the move was conditioned on him finding employment once there. *See* Tr. at 111:16–115:2. The Court does not find Respondent's testimony on this issue credible. As an initial matter, Respondent did not proffer these facts in his prior declaration to the Court, though he had the opportunity to do so. *See* Dkt.

3

No. 27; *see also* Tr. at 97:23–98:5; 110:7–12. Rather, he acknowledged that the family moved to Switzerland in 2017, and he moved back to the United States only after it was clear that he and Petitioner would not reconcile. *See* Dkt. No. 27 at ¶¶ 4–6, 10–11, 15; *cf. Mozes*, 239 F.3d at 1076 (acknowledging circumstances where "the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move"). Additionally, Respondent was evasive and vague when questioned about the nature of the conversations that he had with Petitioner about the move. *See* Tr. at 111:16–115:2. Both before and after the move, however, Respondent actively sought employment in Switzerland. *See* Dkt. No. 27 at ¶ 5; Tr. at 111:9–10. Indeed, Respondent repeatedly told prospective employers—as late as July 2018—that he was living with his family in Switzerland "on a permanent basis." *See, e.g.*, Tr. at 25:7–27:18; 110:13–111:10; Pet. Trial Exs. 7, 9, 12–13, 15–16. During the hearing, Respondent suggested that he made less-than-candid representations in the letters to appear more employable. *See* Tr. at 110:13–111:10; 111:16–21. Of course, Respondent's supposed willingness to shade the truth when he thinks it to his advantage to do so hardly helps his credibility before the Court.[1] Petitioner, on the other hand, credibly explained that the parties had agreed to move to Switzerland permanently, and her account is supported by other external evidence as explained above. *See, e.g.*, Tr. at 116:1–117:11, 119:3–120:15. In short, the Court finds that the parties intended to move to Switzerland permanently.

However, in December 2018, before A.F.A. began kindergarten, Petitioner and Respondent separated. *See* Dkt. No. 8 at ¶ 4; Dkt. No. 27 at ¶ 10; Tr. at 32:2–8. Petitioner and Respondent discussed how they would manage sharing time with A.F.A. *See* Tr. at 34:4–35:24. Petitioner and Respondent determined that A.F.A. would reside in Switzerland with Petitioner, where A.F.A. would go to school as planned. *See* Tr. at 34:4–35:24; 48:22–49:1. Respondent, on the other hand, intended to return to California, where he grew up and where his family still lives,

---

[1] *Compare also* Pet. Trial Ex. 19 at 3–4 (email in which Respondent represented that "[Petitioner] and I discussed the opportunity last night and concluded that me pursuing the role at Straumann was not in either of our best interests") *with* Tr. at 82:13–83:1 (Respondent eventually asserted that his statement in the this email was "untrue," and that he made this supposedly false statement "for [Petitioner's] sake," so as not to "jeopardize her job or her possibilities of advancement or anything like that").

4

to live and find work. *See* Dkt. No. 8 at ¶ 4; Dkt. No. 27 at ¶ 6; Tr. at 34:22–35:9. The parties had previously planned to visit their families in the United States for the winter holidays, so they decided to keep these plans and tell their families about the separation in person. *See* Tr. at 32: 21–33:6. They returned to Switzerland in January 2019. *See id.* 33:9–12. At that time, Respondent returned his Swiss B permit to the migration office in Basel. *See* Tr. at 18:21–19:3; 98: 23–99:3; Pet. Trial Ex. 35 at 2.

Before leaving for the United States again, Respondent helped register A.F.A. for kindergarten in Basel. *See* Pet. Trial Ex. 20. He signed and submitted the school registration form. *See id.*; Tr. at 35:25–38:14; 85:17–87:20; 93:17–95:6; 98:12–20; 100:11–19; *see also* Dkt. No. 27 at ¶ 11. In May 2019, the parties received the confirmation notice that indicated which of the two local kindergartens A.F.A. would be attending. *See* Tr. at 39:10–20; 41:9–42:6. The school year was set to begin August 12, 2019. *See id.* at 39:21–24.

Respondent left Switzerland voluntarily on January 31, 2019. *See* Pet. Trial Ex. 35 at 2. To make the transition easier on A.F.A., Petitioner and Respondent shared time roughly equally with their daughter before she was scheduled to begin school, with A.F.A. traveling back and forth from Switzerland to the United States. *See* Tr. at 6:13–7:1; 38:15–25; 39:25–41:1; 43:22–46:16; 94:25–95:6. But as Respondent acknowledged, this arrangement was only temporary: once A.F.A. began school in Switzerland, she would not be able to travel as readily. *See* Tr. at 93:17–95:6; Pet. Trial Ex. 23. During the evidentiary hearing, Respondent suggested that he thought A.F.A. would continue to fly back and forth to the United States even after starting school. *See* Tr. at 94:25–95:6. Again, the Court does not find Respondent's testimony credible, especially when viewed in context. For example, via text message, Respondent told Petitioner in April 2019, "[r]emember after [A.F.A.'s] Kindergarten starts and I get a job, I won't be able to see her as frequent[ly]." *See* Pet. Ex. 23 at 2; *see also* Tr. at 103:17–104:14; Pet. Ex. 25.

As late as August 2019, Petitioner believed her agreement with Respondent remained intact, and Respondent would return A.F.A. to begin school in Switzerland by August 12. At that time, A.F.A. had been visiting Respondent since July 2019 in the United States. *See* Tr. at 6:13–7:1; 38:15–25; 39:25–41:1; 43:22–46:16; 94:25–95:6. On August 2, 2019, Petitioner asked when

5

Respondent would bring A.F.A. back to Switzerland for kindergarten, and he gave no indication that he disagreed with A.F.A. beginning school on August 12. *See* Pet. Trial Ex. 28. Rather, he reassured Petitioner, explaining "I'm working on everything honey." *Id.* Only later did Respondent explain to Petitioner that he had changed his mind about where A.F.A. should live and go to school. *See* Tr. at 99:23–102:1. Respondent retained an attorney who helped him (1) file for dissolution of marriage in California on August 1, 2019; and (2) explain to Petitioner via email dated August 5, 2019, that Respondent would not return A.F.A. to Switzerland unless Petitioner agreed not to put her in any formal schooling there. *See* Tr. at 46:24–49:1; 105:12–109:14; Dkt. No. 8-5 Ex. E; Dkt. No 27, Ex. A. Thus, A.F.A. remained with Respondent in California from early July 2019. *See* Dkt. No. 8 at ¶ 7; Dkt. No. 27 at ¶ 10. Petitioner, in turn, filed petitions with a Swiss court, on August 13 and 16, 2019, seeking various relief prior to filing this petition pursuant to the Hague Convention. *See* Dkt. No. 8-7, Ex. G.

## II. JURISDICTION

This Court has jurisdiction over actions brought under the Hague Convention through ICARA. *See* 42 U.S.C. §§ 11601 *et. seq.*

## III. LEGAL STANDARD

The Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes [and] . . . seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quotation omitted). "The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must order the return of the child forthwith, unless certain exceptions apply." *Id.* (quotation omitted).

"[T]he Hague Convention analysis is not a determination of custody rights." *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999). Rather, "[t]he Convention . . . empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see also Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("A court that receives a petition under the Hague Convention may not

resolve the question of who, as between the parents, is best suited to have custody of the child. With a few narrow exceptions, the court must return the abducted child to [his or her] country of habitual residence so that the courts of that country can determine custody.").

A petitioner seeking return of a child under the Convention must prove by a preponderance of the evidence that the child "was wrongfully removed or retained" within the meaning of the Convention. *See* 42 U.S.C. § 11603(e)(1)(A). A "wrongful removal or retention" involves a breach of the non-removing parent's "rights of custody," which includes the right to care for the child and determine his or her place of residence. The right at issue must (1) arise under "the law of the state in which the child was habitually resident immediately before the removal and retention"; (2) have been "actually exercised" at the time of the removal or retention; and (3) relate to a child under the age of sixteen. If the foregoing elements are proven, the court must "order the return of the child forthwith." *Abbott*, 560 U.S. at 8–9.

The Ninth Circuit has created a four-step inquiry to determine whether a wrongful removal or retention has occurred: "(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?" *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

## IV.  DISCUSSION

There is no dispute that Respondent retained A.F.A. during her visit to the United States in August 2019. At that point, Respondent explained through his attorney that he would not arrange for A.F.A. to return to Switzerland if Petitioner intended to put her in school there. *See, e.g.*, Dkt. No. 27, Ex. A. Accordingly, the critical question in this action is A.F.A.'s habitual residence as of August 2019. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009) (identifying "habitual residence" as "perhaps the most important inquiry under the Convention"). Petitioner contends that A.F.A.'s habitual residence is Switzerland. *See* Dkt. No. 40 at 3–6. Respondent, on the other hand, suggests that A.F.A.'s habitual residence is the United States because he had no settled intent with Petitioner to change A.F.A.'s residence to Switzerland when they moved there

7

1  in 2017.  *See* Dkt. No. 39 at 8–9.

## A. Habitual Residence

The Hague Convention left "habitual residence" undefined to "leave the notion free from technical rules which can produce rigidity and inconsistencies as between different legal systems." *Mozes*, 239 F.3d at 1071, & n.7.  Nevertheless, the Ninth Circuit has noted the importance of "intelligibility and consistency" over *ad hoc* determinations when analyzing a child's habitual residence.  *Id.* at 1072, & n.10.  The Ninth Circuit, therefore, has created an analytical framework for district courts to follow.  A court must "look for the last shared, settled intent of the parents." *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (quotation omitted).  Before a child may acquire a new habitual residence, the court must determine "whether there is a settled intention to abandon a prior habitual residence."  *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007) (citing *Mozes*, 239 F.3d at 1075).  "Where the child has a well-established habitual residence, simple consent to [her] presence in another forum is not usually enough to shift the habitual residence to the new forum." *Murphy*, 764 at 1150 (quoting *Mozes*, 239 F.3d at 1081). "Rather, the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration." *Id.*

The Ninth Circuit has further explained that shared parental intent is not always dispositive. *See Murphy*, 764 F.3d at 1152–53.  "Certain circumstances related to a child's residence and socialization in another country—a process called 'acclimatization'—may change the calculus." *Id.* at 1152.  However, "[t]o infer abandonment of a habitual residence by acclimatization, the objective facts [must] point unequivocally to [the child's] ordinary or habitual residence being in [the new country]." *Id.*  The Court addresses shared settled intent and acclimatization in turn.

### i. Shared Settled Intent

The shared settled intent of the parents is a highly fact intensive inquiry.  Courts have considered myriad factors to determine intent, such as "parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country;

8

marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009) (citing cases).

A.F.A. was born in the United States and lived there in Arizona with her parents from December 2014 to October 2017. *See* Dkt. No. 8-1, Ex. A. However, applying the factors above, the Court finds that Petitioner and Respondent had the shared settled intent to abandon the United States when they moved to Switzerland in October 2017. Professionally, Petitioner and Respondent severed their ties with the United States. Petitioner sold her dental practice; she cancelled her liability insurance; and both she and Respondent searched for positions in Switzerland. *See* Dkt. No. 27 at ¶ 5; Tr. at 11:14–16; 13:17–21; 111:9–10; Pet. Trial Ex. 3. Although Respondent was unsuccessful in his search, Petitioner accepted employment with the Straumann Group in Basel, Switzerland, after discussing the opportunity with Respondent. *See* Tr. at 10:6–11; 12:6–24; 13:12–16; 24:19–25:2; Pet. Trial Exs. 4, 22. The contract was not term- or time-limited, and Petitioner continues to work for the company. *See id.*

This position enabled Petitioner, Respondent, and A.F.A. to reside in Switzerland and obtain Swiss B permits. *See* Dkt. No. 27 ¶ 4; Tr. at 18:12–20:2; 50:12–22; 70:14–71:11; 99:4–5; Pet. Trial Ex. 35. Respondent provided no evidence, and the Court has found none, to suggest that if the parties had not separated, the entire family could not have continued living in Switzerland. *See id.* Indeed, although Respondent returned his permit, both Petitioner and A.F.A. retain theirs. *See* Tr. at 18:21–19:3; 98: 23–99:3; Pet. Trial Ex. 35 at 2.

Although Petitioner and Respondent had considered opening an investment clinic in the United States prior to moving to Switzerland, and even continued inquiries a few months into their move, neither Petitioner nor Respondent intended to work in the clinic. *See* Tr. at 20:9–23:17. Rather, they anticipated hiring clinicians and using a property manager to run the day-to-day matters. *Id.* As Petitioner explained, their efforts were intended to secure an investment property that they could oversee from abroad for added revenue. *Id.* Despite these exploratory inquiries, the clinic was never opened. *See id.*; Pet. Trial Ex. 11.

9

Petitioner and Respondent also owned no property in Arizona, living instead in temporary housing while they sold or packed their belongings in anticipation of their move to Switzerland. *See* Tr. at 11:21–12:5; 13:20–14:23; 25:3–10. The Court acknowledges that neither Petitioner nor Respondent is from Switzerland, and that they have family who live in the United States. However, that does not preclude Petitioner and Respondent from moving to a new country permanently. Here, in advance of their move, they researched extensively what living in—not just visiting—Switzerland would be like. Factors such as the quality of education, healthcare, pensions, and longevity for people in Switzerland would be irrelevant had the move been intended as a mere short-term "European experiment," as suggested by Respondent. *See* Tr. at 24:5–17; 34:22–35:9; 111:22–112:5; 119:3–14.

Once the family moved to Switzerland, they built a home there together for over a year. *See Mozes*, 239 F.3d at 1078 ("[H]ome isn't built in a day. It requires the passage of an appreciable period of time . . . When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long."). They secured a lease on a home with an indefinite term. *See* Tr. at 16:18–18:9; Pet. Trial Ex. 6. Petitioner and Respondent enrolled A.F.A. in a German-speaking daycare. And even after their separation, they enrolled her in kindergarten in Basel, Switzerland. *See* Tr. at 28:14–24; 30:1–31:19; 85:23–87:17; Dkt. No. 30-3, Ex. C. Switzerland does not necessarily need to be where the parties intended to live forever or "leave [their] bones." *Mozes*, 239 F.3d at 1074. However, the parties intended to abandon the United States for Petitioner's position in Switzerland; they intended to raise A.F.A. in Switzerland; and they intended to live in Switzerland for the foreseeable future.

The Court understands that sometime after January 2019, following his separation from Petitioner, Respondent changed his mind about where he wanted to live and where he wanted A.F.A. to grow up. *See* Tr. at 99:23–102:1. In early 2019, Respondent tried to convince Petitioner that they should move to California, where they have close family, describing it as "kind of a win/win situation for the family unit instead of being half a world apart." *Id.* at 49:3–24; 90:9–24. The Court acknowledges that Respondent may have wanted A.F.A. to move to

10

California, but this unilateral desire is not in itself sufficient to alter A.F.A.'s habitual residence.

Respondent attempts to compare this case to the facts in *Murphy v. Sloan*, 764 F.3d 1144, 1151–53 (9th Cir. 2014), and *Holder v. Holder*, 392 F.3d 1009, 1018–20 (9th Cir. 2004), where the courts found the families' respective moves were only temporary. The Court is not persuaded. In *Murphy*, following the parents' separation, the father agreed that the child could accompany the mother to Ireland for a "trial period" while she pursued a master's degree. 764 F.3d at 1148–49, 1151–52. The district court found that not even the mother intended to live in Ireland permanently, as she applied to graduate schools outside Ireland. *Id.* And in *Holder*, the family's move was based on the father's military duty. 392 F.3d at 1017. The Ninth Circuit concluded that although the family sold their home in the United States, the family did not abandon the United States as their place of habitual residence during the four-year tour of duty in Germany. *Id.* The Court there noted that it was a close call, but the unique nature of military service persuaded it that the parties did not have a shared intention to abandon the United States as the children's habitual residence. *Id.* The Court finds no such limitations on the parties' move to Switzerland.

Having examined the facts for evidence of shared settled intent on the part of A.F.A.'s parents regarding her residence, the Court finds that January 2019 was the last time that Petitioner and Respondent had a shared, settled intent regarding A.F.A.'s habitual residence. At this time, although separated, Petitioner and Respondent intended that A.F.A. would reside in Switzerland and attend school there.

### ii. Acclimatization

To the extent that Respondent attempts to argue, in the alternative, that A.F.A. has somehow acclimatized to the United States such that it is her current—or second—habitual residence, the Court is not persuaded. *See* Dkt. No. 39 at 8–9. Acclimatization occurs only in a limited set of circumstances. *First*, "[w]hen a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time." *Mozes*, 239 F.3d at 1082. *Second*, a child's residence may change by the passage of time "if the child's prior habitual residence has been effectively abandoned by the shared intent of the parents." *Id.* In the absence of either of these circumstances, however, "a prior habitual

11

residence should be deemed supplanted only where "the objective facts point unequivocally" to this conclusion." *Id.* To satisfy this test, the Court must be able to "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Id.* at 1081 (citing Elisa Perez–Vera, Explanatory Report ¶ 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982)).

Here, Respondent testified that he believed A.F.A. was "thriving" in the United States, learning to swim and to ride a bike, for example. *See* Tr. at 95:9–97:14. Respondent also emphasized that she is close to Respondent's family, who live in California. *Id.* at 112:13–113:2. However, even accepting this as true, the Court cannot find that the months A.F.A. has spent in the United States and these positive experiences render her life "so firmly embedded in the [United States] as to make [her] habitually resident" there. *Mozes*, 239 F.3d at 1078. The Court is also cognizant of the inherent risk in inferring that a child's habitual residence has changed based on acclimatizing to the country in which she is being retained. As the Ninth Circuit explained, this could "circumvent the purpose of the Convention" because:

> [I]t could open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit—such as having the child profess allegiance to the new sovereign. The function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life.

*Mozes*, 239 F.3d at 1079. Here, A.F.A.'s circumstances and quality of life in the United States may be relevant to any future custody determination, but the record does not unequivocally establish that A.F.A.'s habitual residence has changed from Switzerland to the United States.

**B.     Breach and Exercise of Petitioner's Custody Rights**

Respondent does not appear to contest that, if Switzerland is A.F.A.'s habitual residence, then he has wrongly retained her under the Hague Convention. Nor can he. At the time Respondent retained A.F.A. in the United States, he and Petitioner were still (and remain) legally

12

married. Respondent has proffered no basis for the Court to find that Petitioner and Respondent did not have joint custody of A.F.A. when he retained her in the United States. And the Ninth Circuit has held that Petitioner's burden in proving that she was exercising parental rights is "minimal." *Asvesta*, 580 F.3d at 1018. As the Court of Appeals noted, "requiring a petitioning party to meet a high bar in demonstrating the actual exercise of custody rights contradict[s] the Convention's objective to reserve custody determinations for the country of habitual residence." *Id.* The Ninth Circuit has explained:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the Court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly.

*Id.* (quotation omitted). Here, there is no basis for the Court to conclude that Petitioner did not exercise her custody rights. To the contrary, throughout A.F.A.'s visit to the United States, Petitioner stayed in contact, and urged Respondent to return A.F.A. for kindergarten, which was set to begin on August 12, 2019. *See, e.g.*, Tr. at 42:16–48:21; Pet. Trial Exs. 23, 28.

//
//
//
//
//
//
//
//
//
//
//
//

13

## V. CONCLUSION

Having found that A.F.A.'s habitual residence is Switzerland, the Court concludes that Respondent's retention of A.F.A. in the United States is wrongful, and the Court **GRANTS** the Petition.

- A.F.A. shall be returned to Switzerland within 14 days of this order and shall remain there until the courts of that country can resolve the custody issues; and
- Petitioner may file a motion pursuant to 42 U.S.C. § 9007(3), to recoup the fees and costs that she incurred to bring this petition, within 14 days of this order.

The Clerk is directed to enter judgment in favor of Petitioner and close the case.

**IT IS SO ORDERED.**

Dated: 10/7/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge